May it please the Court. The United States challenges that portion of the trial court's judgment below, holding that Jazz had established the affirmative defense of permissible repair by preponderance of the evidence. Given that there is no dispute that Jazz failed to establish its affirmative defense with regard to a portion of the LFFPs contained in the two entries, the trial court, in our view, should have sustained customs exclusion as a matter of law. Instead, the trial court instituted interlocutory proceedings that forced customs to use its scarce resources to assist Jazz in sanitizing its illegal entries. We think that's erroneous as a matter of law. Furthermore, the trial court departed substantially from the standards that have been applied in other forms, namely the International Trade Commission, and in the District Court of New Jersey, in assessing whether this affirmative defense had been established. What is your theory? That that should have been treated as the law of the case, or not reviewed at all? The court did appropriately throughout its decision take judicial notice of certain findings and determinations made by the commission, and by the district court, in fact, in discussing the tourist exception. The judicial notice isn't to say that it was treated as binding, is it? Right. That's correct, Your Honor. And we're not contending that it was binding. However, the court, we think appropriately in parts of its decision. The government isn't contending that any of those other decisions is binding? This court's decisions in Jazz versus International Trade Commission in Fuji v. Jazz, these court's decisions are most certainly binding upon the trial court. On the law, not necessarily on these facts. Right. Yes, that's true, Your Honor. But our point in our brief is that the court, and the court appropriately, the trial court throughout its decision declined to create new paths, understanding that it did not possess expertise in substantive patent law. And discussing the tourist exception, it declined to create a new path. In terms of trying to come up with an administrable way for customs to enforce the exclusion order, there has to be some sort of understanding as to what kind of evidence is necessary to permit Jazz to satisfy its affirmative defense. In the commission proceedings, and in the case of Jazz versus International Trade Commission, there was testimony regarding permissible repair. In this case, in neither one of those four, was there any mention made of a reliance upon the presumption of regularity. And in our view, the trial court indispensably relied upon a legal presumption of 100% perfection in law enforcement to hold that it was able to get Jazz over the hurdle in establishing a patent-exhausting first sale in the United States. And that leaves customs really at a loss. How is customs supposed to find an administrable way to enforce this order when the presumption of regularity can be used to fill in a gap? And particularly, there was in the record, through judicial notice, the finding, which is affirmed in this court, that in fact Jazz had imported newly made LFPs in violation of Fuji's patent rights. So the presumption of regularity... Prior to these entries. Prior to these entries. That's true, Your Honor, but there's nothing to suggest that there was all of a sudden perfect law enforcement at the time of these entries in 2004. And there's no legal precedent that would allow an importer bearing the burden of proof. You have two issues. You've got the first sale issue. Yes, Your Honor. Well, they're all partners. You've got the first sale in the United States, and then whether the repair in China buys phototech or what is it? Photorecycling. I mean, no, I'm sorry, polytech. Poly recycling. Poly is the domestic, yeah. Polytech, yes. Which of those do you think is your strong story? The first sale. Absolutely the first sale. Let me ask you this. If you had a situation where somebody was complaining to Customs about the failure to exclude prohibited items. In other words, let's assume for the moment that Company X is, it's alleged, there's an exclusion order, and then it's alleged by the patentee that Company X is importing goods into the United States in violation of the exclusion order, okay? And they go to Customs and say, look, you know, these people are coming in. Would Customs or would it not in that situation say, we're presuming you could be keeping them out? Customs is, you know, Customs would not say that we, that it achieves 100% effectiveness in law enforcement. Oh, yeah, no, nothing's perfect, obviously. I mean, wouldn't Customs in that, I mean, I'm trying to look at, wouldn't Customs in that situation be saying, look, we're presumed, we know the terms of the exclusion order, and we're presumed to perform our duties as a good faith, and that presumption stands. You have to show that we're not doing it. I mean, wouldn't the government in that situation rely on a presumption? Your Honor, the government in the published cases has relied upon a presumption of regularity in the sense that if the government needs to establish that there are certain procedures in place and a letter went out on a certain date, it may be presumed that that letter went out in accordance with the established procedures. We are not aware of any case in which a presumption of 100% enforcement, a perfection of enforcement of law enforcement has been applied to establish an evidentiary verdict. It would be as if you, to presume if, it would be as if I were arrested containing controlled substances from Afghanistan, I say, well, I would presume that the direct enforcement agency in Customs would have kept these out. The presumption of regularity requires presumption of 100% correctness? That's, Jazz has, we're looking to this court for, Customs is looking to this court for guidance, but Jazz, as we read this court's precedent, bears a burden to establish by a preponderance of the evidence, of the evidence, that it is a patent exhausted for sale. And the question is, the evidence must demonstrate by preponderance of the evidence. What was done in the other court was, there were expert testimony with sampling, and actually, Jazz, in those cases, never actually presented any testimony establishing the past of the first sale. So, we're looking for, and the evidence on this record was, in fact, historically, Jazz has violated the exclusion order in significant amounts, and there was a finding in the district court used to establish, to establish a finding of willfulness on the part of Mr. Bennett, and this court affirmed that finding, and the reliance upon the historical violation. I'm sorry, how long has, this is a factual question, how long has the exclusion order been in effect? Since, I'm sorry, I think it's 1999, I don't know. Since about, okay, no, that's fair enough. I don't, I could be way off. No, no, I understand, I just wanted to get a general time frame. So, just to have this sequence straight, let's say that one of the domestic parties involved, whether it's Gujira, whether it's Kodak or someone, is persuaded that customs is not properly administering the exclusion order. Do they go back to the IPC, or to the court of international trade, or both, or do they have a choice? They may go to the international trade. The statute, as it's set up, provides the importer, the patent holder with a number of different remedies, a number of different enforcement procedures, of which Gujira has taken advantage, and both in the commission and in the district court, it has available remedies to it. It does not, the court of international trade does not have the appropriate forum for Gujira in our view. I recall, as I recall, you had here, it was established that, I mean, I think, it seems that the jazz came in with sufficient evidence to show that a purchase, I'm sorry, that these shells were acquired from photo recycling in the United States. Yes, sir. And then there was some testimony, and correct me if I'm wrong, I haven't read the testimony, I'm going by what the district, what the CIT said on the matter. Then the CIT judge said, referred to some testimony to the effect, I think, that generally most of the time when a recycler or a developer gets a camera in the United States to be developed, it was purchased in the United States, right? Yes, sir. Wasn't there something to that effect? Mr. Silvera testified, and the trial court specifically noted there was no documentary evidence offered to support this, but he did testify that based on his knowledge of the industry, such as it was, that 85% of purchasers at a domestic photo processor returned to, when they purchased their LFP at the processor and they returned to get their film developed at that place, based on his knowledge of the industry, and the trial court credited it. We didn't, as repeated... Now, wasn't the court, though, entitled to credit that? It could provide whatever way it could, but there's still 15%, which there's no accounting. And that's where he kind of filled in the gap. And he filled in the gap with the presumption of regularity, and as our view, that's just clear legal error, and that's unprecedented. We're not going to presume to tell the court what we think the court meant in establishing this defense for the court to decide, but that is not what we view as satisfying a preponderance of the evidence standard, and that's certainly not the view that the district court took in New Jersey or the commission took. In those cases, there was sampling presented, and there was testimony regarding the processes and the sorting process. The other fundamental error that we believe that the trial court made, and I realize I'm going way over, is that it relied that there was no practical way for sorting, and that was the commission finding, as the trial court acknowledges, the commission expressly found that there are practical ways to sort shells. And the trial court justified its reliance upon the presumption of regularity on the theory that Jazz did not have access to Fuji's confidential information, and otherwise this court's permissible preponderance wouldn't have any meaning. And we believe that that reasoning is contrary to what the commission did. The commission is the expert. Let me ask you just one final question. I apologize for sort of keeping you over your time here, but it is an interesting case. Mr. Silvera testified the line that you described, in fact, you characterized it at least as the CIT had it. And you said that that left unaccounted for 15%. Yes, Your Honor. All right. Now, the judge directed that there be this segregation process, and that they go through and they take out the, what was it? The seven box cameras. Yeah, those cameras. Now, what if they just went through and then they just arbitrarily took out another 15% of what was left? Wouldn't you then be, in your view, in line with the testimony of Mr. Silvera? No. So no harm, no foul. Well, Your Honor, again, we strongly believe that Jazz is the importer, that Congress intended to vindicate the valid rights of Fuji as the patent holder, and that under the precedent established by this Court, Jazz bears the burden of establishing its defense by a proponent to the evidence. There's no question that these LFPs are subject to the exclusion order, but for the establishment of the defense. It's not as if these were bananas and customs misclassified them.  My question is, can Jazz use this presumption with quotes around it in establishing its defense? And we say absolutely not as a matter of law, because it bears the burden of proof in this case. And that this is an important element of establishing a patent exhausting for sale. And I see I'm way over. Any more questions? I did reserve one minute for rebuttal. Yes. Thank you. Mr. Rosenthal, are you going to help us with the merits, or are you going to argue about Well, Your Honor, I am prepared to help you on the merits, but my initial brief is on the issue of Fuji's non-participation. Okay. But I am pretty clear from the brief. I think we have that point. All right. I find it inconceivable that an intellectual property rights owner's property could be put at issue, enforceability, interpretation, et cetera, without the benefit of the intellectual property rights owner. I don't think that's the scheme. I think Joinder and Rule 19. In other words, you're not arguing the merits. Oh, no, I'll go. I'll argue the merits, Your Honor. I would join Judge Lurie in urging you to talk about the merits. All right. Your Honor, what this court, in my view, the problem here is that the role of the CIT versus the role of the customs versus the role of the ITC in a 337 case is being distorted. I think it was Judge Nichols back in 1983 who said that the ITC is the chief of police and customs are the cops on the beat. There is a—and this court in Fuji v. ITC said that the orders of the ITC, even enforcement orders, I would submit even advisory opinion orders, are instructions to customs as to how to enforce the orders of the ITC. And what you have here is in the rubric of a de novo review, the ITC disappears from the picture. Whatever the ITC found, and it was very relevant, for example, on the issue of the process, the very selfsame evidence which the ITC found wanting in Enforcement 2, which is now in Enforcement 3. So to find that not only was the process good as to Kodak cameras, but it was good also as to Fuji and Konica, et cetera. In answer to your Honor's question about taking 15 percent off the top, my simple answer is that's not the law. These products are boxed in cameras. You can't see the camera until you open the box. You can't say which are the Kodaks, which are the Konicas, which are the Fujis, which are the 15 percent from the outside of the box. It seems to me that the customs process requires—and in fact the patent law, and in fact the 337 requires greater particularity than that. So that isn't a solution. But I don't think that it's sufficient to say that we're dealing with a different shipment as a grounds for erasing what the ITC did or starting de novo or starting again. If customs' job is to figure out how to enforce the orders of the ITC, then it seems to me the CIT's job is to figure out whether customs properly enforced the order, not to decide again whether something is an infringement or isn't an infringement. I think the focus of the CIT should be narrower than it was in this case. There was another issue that Geron raised. What, in your view, then, is the proper next step? We're in administering and figuring out the origin of these shelves. I gather your position is that if there are any erroneously—or shelves that should not be admitted in the batch, the whole batch should be excluded? Yes, Your Honor, because the JAS elected to present the merchandise in a way that this segregation was impossible. The only way to segregate would be to open up every box, destroy the marketability of the product, and maybe see whether this is a Kodak, this is a Konica, this is a type of Konica that has never been sold in the United States. Your Honor, unfortunately, the record stops in this case at a point certain. Time has not. This dispute has not. There is now pending in the District Court of New Jersey a case that covers these cameras. And that case, in fact, is before this Court on a motion for—on a motion—I'm sorry, on an appeal from an order of preliminary injunction. And the gist of that argument—this is on behalf of JAS's successor—is that once you have a 337 case, then the District Court is ousted of jurisdiction and CIT is the only court that can hear the case. But the District Court rejected that and went one step further. It found it was likely that Fuji would prove that these cameras would be infringing and issued a preliminary injunction. In fact, it went further. It issued a writ of attachment against funds owned by the manufacturer in the United States, pre-judgment writ. The government's argument is that this is Fuji's remedy, not through the— Well, Your Honor, that is very, very impractical. Your Honor, the issue that Your Honor raised—Your Honor's raised before—was what happens if Fuji is dissatisfied in the—with customs performance, which we were for many years. And what we did is we went to the ITC and we had an enforcement proceeding. And the ITC found that as of December of 2003, from September 2000—from August of 2001 to December of 2003—93 percent of the cameras imported by Jazz were infringing. Now, what good does it do Fuji to come at that late stage when the goods are in the country, Jazz is bankrupt, Ribi, who's the successor, has no assets, the manufacturers are outside the country? There has to be a way for Fuji to contest the entry of the goods at the time of entry. In a practical manner, though, how does—how is—how does customs enforce an exclusion order? I mean, they have an order to keep out certain cameras. How do they go about doing that? They obviously can't—is it a sampling sort of an example? Well, I think it depends on the nature of the patent issue or the trademark issue or the copyright issue. In a conventional patent infringement case, what they would do is there were customs laboratories scattered throughout the country, and they would read the interpretation of the claim and understand what the ITC did, and they would, with the greatest of reluctance, try to figure out whether that's an infringement or not, this new product, especially when you have a general exclusion order which—where it covers parties who were not before the ITC. In this case, they didn't have to go that far, but what they had to do is figure out whether the standard imposed by this court in 2001 and applied by the ITC in Enforcement II was satisfied. Was there proof of first sale? Was there proof of a permissible process? So that seems like a pretty tough chore for someone in a customs house. It is. I think that's a statutory scheme we're stuck with, but you're right, Your Honor, and I think customs would like to get rid of this chore as quickly as they could if they could, because it is very hard. I don't want to mislead anybody, and the remedy that Fuji has has remedies in the district court, has remedies in the ITC, but the only immediate remedy to stop the immediate flow of goods is to go into the CIT by mandamus. One question. Where physically are the cameras that are the two shipments that are before us? The photo recycling cameras are in the country sold, gone. They were delivered to Walmart and are gone into the stream of commerce. The seven bucks cameras were actually sold to Jazz's successor and were exported. So the cameras that are at issue here are not retrievable by customs or anybody? And not examinable, because what my position is that in the absence of Fuji, who has a huge amount of knowledge and experience, unfortunately we're dealing with the most persistent infringer I've ever encountered. Well, let me ask you, what would be the result then of a ruling in favor of the government in this case? This is an appeal from an enforcement proceeding, correct? Well, this is an appeal from customs, an appeal from the reversal of customs refusal to enter. So it's a protest case. But it has been entered by order of this court. We, at the start of this appeal process, asked this court not to permit entry, but to give this case expedited consideration, hold the goods, and let's find out what the answer should be. But they haven't been held. But they haven't been held. Your Honor, we denied our application in that regard, did not require reposting of any sort of meaningful bond. So whether rightly or wrongly, is the case moot? I don't think so, Your Honor, because we're going to be here again tomorrow. How do we address... Literally tomorrow? Well, maybe Thursday. No, but I'm saying if we're dealing about enforcement of an exclusion order, and whether rightly or wrongly, this court has allowed the goods to be dispersed, what would be the effect of a ruling either way? Am I missing something? Well, no. There is a technical effect. I don't know how practical it is, in the sense that Customs could then demand redelivery, which won't happen, and can levy penalties for failure to redeliver it. And that's the remedy that Customs has on this set of facts, and that's the remedy that was developed because very often the goods are gone by the time the court gets to the product. But I don't think that's an excuse not to decide this issue. It was said before, these are interesting issues. I think they're beyond interesting. It's just the relationship between the CIT, the ITC, and Customs is so significant in enforcing Congress's intent to keep out products that are violent of U.S. intellectual property rights owners, that you need to address this issue. This is not moot. It's not academic. It is an important issue. Thank you, Mr. Rosenfeld. Mr. Peterson. Thank you, Your Honor. From the moment FUJI filed its 337 complaint years ago, it had the effect that it would have to realize that the necessary end point to the enforcement of the exclusion order would be the point we've been brought to today. Customs enforcing the order excludes shipments of merchandise. A protest is filed and denied. The case comes to the United States Court of International Trade, and the Court of International Trade is required to decide did Customs properly exclude these goods under the 337 order, or should they have been imported? Now, as in all protest cases, Customs did a de novo trial. Rather, the Court of International Trade did a de novo trial. The government elected not to put a case on it. When you say de novo trial, of what? You're including patent infringement as a de novo trial? Well, no. They were not really looking at the issue of infringement. They were assuming that there would be infringement but for proving the affirmative repair, the 2001 decision in Jazz v. ITC. In other words, the issue was whether they manufactured in the United States. Well, the issue was whether they had manufactured. Well, there were two parts of the issue. The first issue was whether the repair operation that was done in China conformed with the process that this Court identified as permissible repair. And there was extensive evidence on that, and none of it was contested. The second issue, which Ms. McCarthy indicated is the harder-to-prove issue, is the issue of proving that the cameras that were repaired were from shells that had undergone the patent-exhausting first sale in the United States. Now, the Court of International Trade marshaled an awful lot of evidence on that. The first thing is we established, with regard to all of the cameras that were admitted in enterprises from U.S. photoprocessors. Now, what that testimony indicated, Mr. Silvera's testimony, was that photoprocessors tend to get these cameras one, two, or three at a time to develop film. It's not a big load of foreign shells coming in. Okay, that's not what happens. And, in fact, photorecycling sent all the photoprocessors prepaid UPS mailers in boxes so that those photoprocessors could send the shells to them. So there was a lot of evidence, because it was testified that shells sold or brought in from processors in the United States overwhelmingly tended to have been bought in the United States. Doesn't this case hang on a presumption of regularity? Well, only a little bit, because the gap that the presumption of regularity was invoked for was extremely minor. I just want to correct one misimpression that was given before. Mr. Silvera didn't testify that 85 percent of the cameras were bought in the United States if they were returned from photorecyclers. He testified that 85 percent of those cameras would have been purchased at the very same photorecycler that returned them. So the remaining cameras were also cameras sold in the United States. But when we come to the presumption, Your Honor— How do you know? Is that an issue before us? No. Do you just want us to disagree with your witness? Well, no. It was a finding of fact made by Judge Stansu, and I don't think there's been a charge of clear error by the other side on that before this Court. But the presumption—the presumption was invoked for very minor, very minor purposes and quite proper purposes. We traced all of the repair steps. The evidence before the Court of International Trade traced all the shells from the time they were collected to the time they were exported. And through the repair process, all of these were identified by lot numbers and to the point where they were returned to the United States. And in fact, it turned out they were quite segregable when Judge Stansu said segregate a certain lot out in this case. They were quite segregable. So the evidence was overwhelming that there was permissible repair and that the cameras were cameras that had undergone a first sale in the United States. And what the government said is they said, well, wait a minute. How do we know that all the cameras that were here in the United States and were sold by folks in the United States were legally here? How do we know that infringing cameras weren't imported? And the answer very simply is that, well, customs would have excluded those cameras. Now, that's— But Mr. Coffey says customs isn't 100 percent perfect. I don't know that customs has to be 100 percent perfect. There's not—Judge Stansu did not invoke the presumption of regularity to say that there was a presumption of 100 percent inspection. He simply said, well, you know, Jazz has proven where all the shelves came from. They've proven that the permissible repair had come through. They demonstrated their case by a preponderance of the evidence. And now it's up to the government to come in and rebut the evidence. The government didn't put a case in chief on here. And the government sort of said, well, how do we know that the cameras that were in the U.S. and were sold by these photo finishing companies, by the Walgreens, by the CBS, how do we know they were in the country legally? Because that point does really support Fuji's argument that they should have been permitted to contribute to the litigation. They certainly could have contributed to the litigation as witnesses for the On the question of should Fuji have been allowed to intervene, it's simply not permitted by statute in a protest case. Even the government agrees with us on that. But the fact that Fuji couldn't intervene as party, the fact that their intervention was blocked by statute, in no way limited Fuji from participating in the case and providing to the government all the resources and expertise they claimed they can bring. They didn't do it. I can't rewrite the statute. Maybe the government wasn't so interested in Fuji's participation. We don't really know. But when you tell us that there was no response by the government, you're protecting the interest of customs and saying that you're putting too heavy a burden on customs. Not that there shouldn't be this sorting, but that someone else should do it. Well, the burden really rested entirely with jazz. I mean, customs was protected coming in by a presumption of correctness. The specific presumption of the exclusion was proper. We had to overcome that. After we had overcome that, customs said, well, and speculatively, well, how do we know that all those U.S. shells were lawfully in the country? How do we know that some shells came in that shouldn't have come in? We don't know the answer to that. But if anybody has the answer to that, it's not us. It's customs. You're saying, Mr. Pearson, you were Mr. burden of proof, and in meeting that you were helped in one aspect by the presumption that the judge relied upon. It wasn't used as an evidentiary presumption. It was basically used to repel the government's speculative argument. Well, how do we know that those cameras were in here legally? How do we know that they weren't here illegally? Well, are they thrusting on jazz the burden of proving where 100% of the cameras came from and that the customs didn't let any in accidentally? That would not have been a proper move. Let me ask you if I could. I don't want to get a sidetrack here. Maybe I'm just completely wrong on this, but Mr. Rosenthal says cameras have been released, correct? That's correct. What would be the effect of a ruling in your favor in this case? It would just be affirming what the CIT did, correct? It would also help jazz and similarly situated people who want to engage in the permissible repair of these cameras to know what evidentiary burdens they'll need to meet to prove their admissibility. At the time this appeal was filed, there were a number of other cases pending in the court of international trade involving the exclusion of jazz cameras. There still are. But we're rendering an advisory opinion. We have a case of controversy now. It seems we're all out into the stream of commerce. You do, Your Honor, and I think there have been some cases saying, well, in the court of international trade, if you have a case which involves, say, the exclusion of perishable merchandise, which this does, if the perishable merchandise has to be disposed of or is disposed of, that wouldn't be the case. And again, this would be an issue that if the court doesn't resolve this, then we're going to face this again because the government will just continue to exclude goods and we'll have to do the same trial again and again in the CIT. What would happen if we were to rule in favor of the government against your client in this case? Aside from our ruling being on the books, what's the practical effect? Now, Mr. Rosenthal says they can issue a retraction order for the cameras? They could ask for redelivery. The fact of the matter is that by virtue of the government wrongfully excluding cameras and not even speaking to that in court, jazz photo of my client was forced into bankruptcy liquidation. So on this particular client, no particular effect. I mean, the liquidation process is ongoing. I'm just wondering. It seems like this particular dispute may be moved. No, I don't think so. I think what this dispute involves is the practical application of this court's 2001 decision in jazz photo versus the ITC. But if it doesn't make any difference to the parties in front of it. Well, it does make a difference to us in the sense that there can be a demand for liquidated damages against the jazz photo bond, which would still stand for these cameras. And also, again, on the theory of an issue capable of repetition and evading review, it's certainly not moved. But that's not the point. The damage is on the bond. It makes the case lie. I think so, Your Honor. But let me just mention the presumption. Judge Stansu applied the presumption only to new cameras. In other words, it only applied to camera shells that were returned new, that hadn't been repaired before, that had their original label in, and that came from photo processors. So there was no presumption as to any cameras that had previously been repaired or found to infringe or anything like that. It was a very narrow use of the presumption. Secondly, the earlier decisions regarding jazz have nothing to do with this case. The district court case involved cameras imported from 1996 to 2001, before the ITC exclusion order became effective against jazz. The ITC Enforcement 2 proceeding involved cameras imported from 2001 to 2003, and there are currently four appeals pending in this court from that decision. This case involves a particular shipment of cameras that made and imported in 2004. Two shipments. Two shipments. But specific evidence was given. I mean, there were things that had tripped up jazz before. Well, were there foreign shells here? That's what tripped jazz up in the district court case. No, they had eliminated foreign shells. The evidence showed that the shells were gathered in the United States. Were there problems with replacing certain backs on Kodak cameras or repairing cameras a second time that the ITC had found problematic for the 2003 imports? No. The testimony indicated that that had been eliminated. So the Court of International Trade is required to decide this case on the specific facts relating to these cameras, and that's exactly what the court did. And the court found that we had met our burden to show that there was a permissible repair and had met our burden to show that the cameras had been sold in the United States by a preponderance of the evidence. In other words— Explain to me again, how does this bond— how does the bond play into this possible mootness issue? Well, all imports are supported by a customs bond for the payment of liquidated damages for failure to re-deliver. If you would rule in the government's favor, they would ask for re-delivery. They would make a demand on the bond. The surety, in turn, would make a demand on the jazz bankruptcy trustee to be paid under the bond. So it does still have an impact. It makes this case a live case of controversy, both in the constitutional sense and in the sense that we have prudential standing as well. But I guess the point, though, to be made also, there's been—you know, they talk about the evidence provided during the Enforcement 2 case. And there was videotape that was shown. The government says, well, the ITC judge didn't like that, the Enforcement 2 case. Well, he didn't accept that videotape in the Enforcement 2 case as evidence of what happened at five other factories as to which he said jazz had put on the witnesses. If you look at the record in this case, Your Honor, you'll see that jazz put on very systematic evidence showing that the cameras were collected in the United States from photoprocessors. They were tracked to China. They were sorted in China. Any cameras that showed signs of prior repair or eliminated any signs of cameras that didn't have their original labels eliminated. Any cameras showing foreign language labels were eliminated. There has been an evolution, obviously, in what has to be done to establish the permissible repair defense. This case represents the point in the evolution where the Court of International Trade said, jazz photo, you got it right. And we think that this Court should affirm that decision because it does give practical life to this Court's 2001 jazz versus ITC decision. Finally, on the matter of Fuji's purported appeal from its denial of a non-motion made to intervene, we're just going to rest on what we said in our briefs. We think the motion was frivolous. There was no motion made to intervene, no order of the Court denying a motion by Fuji to intervene in this case. And when Fuji filed his brief, it did not address... That wasn't argued in the case in chief, so we don't need to read through it. Okay, they didn't address the statute barring interference. We'll look at it on the briefs. Thank you, Your Honor. Thank you, Mr. Peterson. Ms. McCarthy. Thank you, Your Honor. Very briefly, first of all, to confirm, it was 1999 when the order was issued, Judge Schall. Oh, so that's when the exclusion order issued? Yes, yes. Ms. McCarthy, let me ask you, do you agree with Mr. Rosenthal, first of all, that all of the cameras have been released? Yes, they have been released, and I wholeheartedly concur with Mr. Peterson, which I'm delighted to say, about the mootness issue. This was actually a concern that we raised. We took the unusual step of actually asking the Solicitor General for permission to seek a stay in a bond, and we were advised in no uncertain terms by this Court that that was really unavailing. But we were, in the course of that briefing, Jazz repeatedly assured us that we would have remedies under the continuous entry bond, and that's for purposes of mootness. So you agree with, while you don't agree on the merits of Mr. Peterson, you agree with him on this mootness question. Absolutely. Namely, it's not moot, there is a case of controversy because of the existence of the bond. And we were very concerned about that, which is why we took measures. But we were comforted, at least with the notion that there would be a continuous entry bond that would keep this case alive. Because I think everyone here agrees that it's important that we get resolution to this issue. As to the issue, briefly, about why the government didn't put a case on chief, this case went to trial in eight days after the complaint was filed. And Jazz had presented evidence that it was going to go out of business. It was already in bankruptcy. It was going to go out of business if this case were not highly expedited. To the extent that the government, we consented to that because we did not presume, being officers of the court, that these declarations were under perjury. We were perjurious. However, it wasn't certainly our preference to go to trial so quickly. And in other cases, we have retained experts to do sampling. And we would, if we had more time, put on a case in chief. But the reason why we did not put a case in chief on this is because we felt very strongly that they had the burden of proof and that it was up to them to establish it. And finally, if I could just draw this Court's attention to 353 F sub 2nd, 1334 of the trial court's decision. The trial court stated very specifically, and this is where we agree with this, rather the court concludes that from these sources of law, meaning the precedent of this court and the commission, that the Jazz must meet its evidentiary burden through factual evidence establishing for sale that goes beyond the mere fact that the shells were obtained in the United States. And we wholeheartedly concur with the trial court's conclusion in that regard, but feel that by relying upon the presumption of regularity, the trial court itself is not fulfilling this statement that the trial court itself said. Thank you very much for your indulgence today. Thank you, Ms. McCarthy. Mr. Rosenstein, you have a minute. I would just like to correct two very quick factual statements of Mr. Peterson. The videos in question were of Polytech. They were used by the—accepted by the ALJ to show that refurbishing of Kodak shells at that factory was permitted, yet they still found that 83 percent of the shell of the cameras made in Polytech during the period in question, which is a little—2003, in fact, infringed. The other point I would like to just reaffirm is if we can't assume first sale if purchased in the U.S., as the judge found at the beginning of the opinion, how can we assume first sale has been satisfied as to the 15 percent, the providence of which—the only evidence we have as to the providence of which is that they were bought from a photo processor who got them somewhere. We just don't know as to that 15 percent. Also, jazz was put out of business by the bankruptcy judge when in January of this year the commission issued its opinion and found that the infringement, the violation of its orders through December of 2003 was caused by the bad faith conduct of jazz and its officers and levied a $13.675 million civil penalty, which was far and away the largest civil penalty ever levied. The bankruptcy judge said he would have shut down the company when he read that under any circumstance, but he actually shut it down as part of a stipulated resolution of a lot of other things. But Fuji was never permitted to come to district court or to any other court during the life of the bankruptcy. The bottom line, though, is that I don't know how the CIT can resolve this kind of issue in Fuji's absence. I'm not sure that I understand how the CIT can resolve these issues de novo by starting again without recourse to the record that happened in the ITC. And I think those two are just impossible. Thank you very much. Thank you, Mr. Rosenthal, Mr. McCarthy, Mr. Peterson. The case is taken under submission.